I am here representing the San Luis Obispo Mothers for Peace, the Sierra Club, and Peg Pinard. With me today at the council table is Claudia Polsky of the Attorney General's Office of the State of California. I would like to reserve five minutes for rebuttal. In the time I have this morning, I would like to address four issues. You're going to say five minutes for rebuttal. Is the Attorney General going to use any of your time? No, I'm going to take the entire time. Is he a for moral support? Yes. Of course, why we're here, why NEPA is different from the Atomic Energy Act requirements that the NRC claims to have complied with. Second, why the environmental impacts of a terrorist attack against the Diablo Canyon spent fuel storage facility are proximately caused by the licensing of the facility by the NRC. Third, why it was unlawful for the NRC to apply the PFS decision to deny petitioners a hearing in this case. And finally, why even assuming for purposes of argument that PFS could be applied in this case, it should be rejected as inadequate support for this decision because it was arbitrary and capricious. The NRC has suggested that a NEPA review in this case would simply be a rubber stamp of the security and safety review that the NRC conducts under the Atomic Energy Act. And I just want to make sure the Court understands that we do not view it that way at all. NEPA is a separate and independent statute that has a different practical effect in terms of the considerations that it requires. Under the Atomic Energy Act, the NRC considers what's called the design basis threat, a threat that the NRC considers to be realistic and likely. The NRC establishes minimum requirements to protect against that threat. The NRC is entitled to go beyond that but does not generally go beyond that. For instance, the NRC design basis threat does not include a crash of an aircraft into the proposed spent fuel storage facility. That is considered to be a threat that goes beyond the design basis. And that, the difference between the design basis and the beyond design basis for purposes of the safety analysis is discussed at length in the Limerick Ecology Action Decision that's cited in our brief. Also, if you look at PG&E's brief at page 42, PG&E talks about beyond design basis security threats and assumes that those are threats that are taking care of the military. But in fact, NEPA has no exemption for military issues and we're here contending that beyond design basis threats include reasonably foreseeable but low probability threats which are required to be considered under NEPA. So the scope of impacts or threats that are considered under NEPA is greater than is considered under the Atomic Energy Act. Don't you think the Atomic Energy Act informs the NEPA analysis though? They overlap to a degree and yes, it does inform the NEPA analysis but NEPA goes beyond it. And in fact, NEPA may push the agency in its consideration of what ultimately becomes part of the design basis threat. NEPA requires the NRC to take a hard look at impacts that may not be within the ordinary realm of security considerations that are looked at by the NRC. It pushes the NRC beyond that to look at low likelihood but reasonably foreseeable events. Where do you get that exactly? That comes from the NRC regulations, 40, not NRC regulations, excuse me, Council on Environmental Quality regulations, 40 CFR 1502.22. And so in this case, you're arguing that the terrorist threat is reasonably foreseeable but low probability? We believe it is and we have asked the NRC to give us a hearing on that question which we believe is a factual determination, not something that could be cited by the NRC as a matter of law and applied to us to deny us a hearing. The last time Let me ask you another question about that. Just as a matter of fact in this case, there was no actual finding anywhere that the events were either reasonably foreseeable or not foreseeable but of any particular probability. I mean, there is no finding in those specific terms, is there? Well, there is the PFS decision in which the NRC declared that the environmental impacts of terrorist attacks on nuclear facilities are remote and speculative. In other words, they're too unpredictable to be considered reasonably foreseeable. But that decision was made after a legal briefing was not made on any kind of factual record. And so remote and speculative is the opposite of reasonably foreseeable but low probability? Yes. It's a probability is too low to be worthy of consideration. NRC regulations do require that in evaluating environmental impacts, first of all, the agency has to quantify the environmental impacts. And if it can't quantify them, it has to describe them qualitatively. That's 10 CFR 51.71. And in this case, the NRC has said we can't quantify this. It's not something that's subject to probabilistic risk assessment. But it has refused to provide any kind of qualitative analysis, even though it's perfectly capable of doing that. As reflected in the vehicle bomb roll from 1994, which is cited in our brief. I wanted to ask you something. In some of these earlier cases I read, there was some notion that, well, with these total disasters, it's obvious that there are going to be these tremendous environmental effects, and therefore it's not necessary to analyze them. Is that present in this case? Well, I think what you're referring to is the worst-case analysis, which that was a former rule of the CEQ that required agencies to evaluate worst-case events regardless of their likelihood. That is not what we are asking for here. The CEQ regulations require the agency to consider potentially catastrophic events if their likelihood is reasonably foreseeable. So yes, it could be that the NRC must consider catastrophic events under the CEQ regulations. They do have to be demonstrated to be reasonably foreseeable. My question was a little different. I was wondering whether there was a finding in this case that the effects are obvious, and therefore there's no point. I do not recall that kind of a finding. And in fact, the impacts of a successful terrorist attack could be somewhat different. And that is something that we asked the NRC to look into, because you're talking about penetration of the containment in a violent assault, which may have different consequences. Accidents develop differently, and it makes their consequences different, and it also makes the kinds of alternatives that you look at to mitigate or avoid those alternatives different. Are you talking about the storage facility? Yes. Okay. So we're still talking about the storage facility. Yes, we are. And that is another difference between NEPA and the Atomic Energy Act. The Atomic Energy Act requires the establishment of minimum standards for protection against the design basis threat or undue risk to public health and safety. NEPA requires the agency to look at an array of alternatives, reasonably available alternatives, for avoiding or mitigating the environmental impacts of the event, and also doing a cost-benefit analysis. In other words, looking at whether it would be cost-effective to do some of these things, even if they're not required for a minimum level of protection. And of course, the NRC is not required to implement these things, but it is required to consider them and to discuss them in an open forum with the public and with state and local decision-makers, which has not been done here. Everything has been done in secret that relates to security at the Diablo Canyon Nuclear Facility. Well, not completely in secret. The nuclear industry has been invited to the conversation, but the members of the general public have not. It's one of the central features of NEPA that it requires a public discussion of environmental impacts and of the costs and benefits of alternatives for mitigating or avoiding those impacts. And there are real practical impacts that the petitioners would like to see considered here, such as dispersal of the cast over the site, which is on a hillside overlooking the Pacific Ocean, is vulnerable to an airborne attack, or storage of the fuel underground in berms, or fortification of the cast beyond the structure that they're currently in. I'd like also to talk about proximate cause, which is one of the NRC's principle. It is the main legal theory on which the NRC relies for purposes of claiming that we are not entitled to a hearing. NRC argues that the NEPA chain of causation is broken by terrorist attacks because they are independent criminal actions performed by third parties. But I think it's important to recognize that independent third parties are often involved in indirect impacts. For instance, following issuance of an Army Corps of Engineers permit was found to constitute an indirect impact in Save Our Sonoran V Flowers, which is discussed in, this is a recent case that's discussed in correspondence with the court. Increased boat traffic, followed by expansion of a dock, was considered to constitute a valid indirect impact in Ocean Advocates versus Army Corps of Engineers. Those are cases where there's some independent third party that's making decisions and doing things that the NRC doesn't have control over, but those impacts are foreseeable, and therefore are considered, must be considered in an EIS. What about No Gwen? Well, in No Gwen, that involved the construction of radio towers, and the question was whether a nuclear war was foreseeable as a result of that construction. And the court found that it was remote and speculative whether a war would result from that, whether the very existence of those towers would promote a nuclear war. And there has never been a nuclear war on this continent. There have been terrorist attacks on this continent, and that is, that's one of the differences here. It's a factual question as to whether experience that has developed over the years would lead the agency to conclude, while we may have thought something was remote and speculative in the past, we can no longer say that. And the NRC began to say that in 1994 with the vehicle bomb rule. And then of course September 11th happened, and the agency diverted a great deal of its attention to preparing for terrorist attacks against nuclear facilities. The only thing it hasn't done is to integrate that into the NEPA process and include the public in that decision-making process. There are basically three exceptions to the chain of causation that the courts have recognized, and we would submit that our case doesn't satisfy any one of these. One is that the courts have found that the causal chain is broken where the impacts, the physical impacts flow directly from a nonphysical event. For instance, in the Metropolitan Edison case, psychological impacts or environmental impacts, but they flowed from a nonphysical event, which is fear. In Presidio Golf Club v. National Park Service, the impacts were real, deterioration of the environment, but they flowed from economic competition, which is a nonphysical event. That's not the case here. The impacts that we're concerned about flow from a physical attack on a nuclear facility. There's not a nonphysical intervening event. This is also not a case where there are no environmental impacts at all, such as Ranchers Cattlemen Action Legal Fund v. USDA or Glass Packaging Institute v. Reagan. And finally, this is not a case like DOT v. Public Citizen where the agency involved has, the agency that's been sued, has no actual control over regulating or stopping the impacts. In that case, the agency that was sued was the DOT that was regulating the safety of trucking, and the DOT did not have the authority to stop the trucks from entering the country. That was the responsibility of the President. You know, the two cases that are in the circuits, what, Limerick and the New York City case that came out the other way, how do you distinguish those two cases? Well at the time they were before 9-11. Is there anything else? Right. Well, yes. Well, Limerick was, that was a case that was decided by the Appeal Board in 1985, and the Appeal Board said that the NRC was not capable of quantitatively assessing the risk of environmental impacts of sabotage, and therefore there was no meaningful way to assess those risks. And of course, we're saying that situation has changed, and the best evidence of that change is the 1994 vehicle bomb rule and also the various pronouncements that the NRC has made since September 11th. In the City of New York So you're making that assertion on the basis of what the agency has done as opposed to some scientific development that's occurred? Well, the agency has shown that it has learned something. It has developed new tools for assessing these risks, and so that is what we're relying on. We're actually using the agency's own statements that it is capable of assessing this risk. The City of New York, it's interesting if you look at the decision, it's clear that there was an actual factual record developed in that case. There was expert testimony about the likelihood of a, I think it was a terrorist attack or sabotage on these transportation vehicles, and the court said that there was a record, that the record evidence supported the court's finding, the district court's finding that these impacts were remote and speculative. So there was an opportunity there to actually present evidence and talk about the facts. And here, the NRC has simply made a legal pronouncement, or they called it a legal pronouncement in the PFS decision that we can't do this. And interestingly enough, the NRC has not mentioned the vehicle bomb rule in either the PFS decision or the decision in our case. And that was a central piece of evidence in our contention that we wanted to present to the Commission and litigate how this vehicle bomb rule could be used, the kind of reasoning that was used there, could be used in a NEPA analysis. And we were able to do that. It brings me to the issue of whether the NRC could just wholesale apply PFS to our case without giving us any opportunity to challenge what was decided in that case. And we rely heavily on Minnesota v. NRC, in which the NRC decided in one adjudication that it was confident about the likelihood that there would be a solution to the spent fuel storage problem within X number of years. And then the NRC tried to apply that in another case where the parties hadn't had a chance to present any factual evidence. And the Court didn't actually decide that the NRC was required to give the parties an adjudication or do a rulemaking because the NRC beat them to it by announcing that it was going to do a rulemaking. And the issue in that case ended up being whether the Petitioners were entitled to an adjudication as opposed to a rulemaking. We understand that the NRC has a choice between proceeding with ad hoc adjudication or rulemaking. But it hasn't done either here. It hasn't given us an adjudication on the facts that we've presented. Certainly the PFS decision doesn't reflect consideration of the facts that we've presented. And it hasn't done a rulemaking to ask for comment on the facts. So it's tried to basically assert that a policy that it announced in another case is dispositive of our case. And that is illegal. All right. Counsel, you've got about 20 seconds left. We'll give you some time for rebuttal if you'd like. Okay. Well, I do want to mention the tort analogy, because I — getting back to proximate clause — oh, now I only have eight seconds. But I would like to just point out that the Supreme Court did rely on the proximate clause analogy and that criminal — in the criminal context, criminal intent does not disrupt the chain of causation. Thank you, Counsel. Good morning. Good morning. I guess it's good afternoon. May it please the Court, my name is Charles Mullins, and I represent the Nuclear Regulatory Commission of the United States of America. We have 20 minutes. I will speak for 15. Mr. Dave Repka, who represents Pacific Gas and Electric, will speak for five. In this case, the Commission found that it was not required to conduct an analysis under NEPA, hypothetical terrorist actions. It took that action as a matter of law. It found that NEPA did not require that from major — for major Federal actions. And that decision is consistent, as I believe Judge Estany noted, with the courts of appeal that have considered that issue on previous occasions, the City of New York, the Limerick Ecology case, the NEPA case. No gwin, in addition to alleging that the towers would — could help start a nuclear war, no gwin alleged that the towers themselves would be heightened targets, like our friends here have argued that the Diablo Canyon IFC would be a heightened target for terrorists. And this Court found that claim to be speculative. The Commission, in this case, after September 11th, went to several proceedings in which this issue was raised. And this was not the only case. If you read the PFS case and the associated cases, there were four cases in which the Petitioners had raised the issue of a NEPA analysis of a potential terrorist attack and its impacts. And the Commission asked for briefs, not just from the parties in those four cases, but put out a Federal Register notice inviting comments from other parties as well, to whether NEPA, as a law, required that kind of action. And the Commission reached a legal decision finding that, under Metropolitan Edison, the Supreme Court's decision that proximate cause was required, but forecausation is not enough. Now, my friend makes the point that these cases — other cases were decided before the Supreme Court was reviewing the restart of one of the reactors at Three Mile Island. The Court of Appeals below had held that the NRC had to consider, under NEPA, the psychological impacts of fear the people had of a risk of an accident. And if you'll look at the end of the Metropolitan Edison case, one of the reasons the Court of Appeals held was that it was proceeding in the wake of a unique and traumatic — I believe I'm quoting correctly — nuclear accident. And the Supreme Court said, we're sorry. But that unique and traumatic accident did not change NEPA law. It did not change — not make the petitioner's concerns into NEPA contentions. Now, my friend also talks about tort action. And she cites, I believe, one of the restatements of torts that people who commit negligent acts or perhaps are responsible for subsequent actions down the road — for example, if you leave your keys in the car and somebody steals it — I would refer the Court to resection — to the section of the restatement, sections 442, 448, and 449, and the cases that are associated there. Under those cases, if you have intervening action, deliberate intervening action, you will many times and most times relieve the initial actor of liability. Now, as we pointed out with Ground Zero and Warm Springs Dam, these actions are not reasonably foreseeable. I'm sorry. I thought you had a question. All right. Turning to the next point, the Commission reasonably uses adjudication. Before you leave that point, though, I mean, it seems to me the import of many of those cases is there's no meaningful way to assess the probability. And it may be that there are certain types of terrorist activities in which that's true. But we do have a meaningful way to assess the probability or at least the impact of certain types of terrorist activities. Truck bombs would be an example. We do it all the time with federal courthouse construction. Those are built into almost every agency's consideration in terms of new construction. Why do you contend you cannot meaningfully assess those types of risk and take adequate precautions? We do assess those kinds of risks under the Atomic Energy Act in a sort of a mechanistic approach by figuring out what possible avenues there are in building in defenses. But it's kind of difficult to figure out what kind of impacts there are. Why is that so? You do simulations all the time. I expect computer modeling of the impacts of certain nuclear release of nuclear material. All right. But under NEPA, of course, if we're going to use NEPA, the object of NEPA is to make those determinations public. And it'd be kind of difficult to go out and do an analysis of, say, a cask. Say we have an analysis that shows if you have a truck bomb that explodes 30 feet away, it doesn't hurt anything. But if it explodes 10 feet away, it hurts something. Kind of hard to make that analysis public and to lead a public discussion with that. No, but I think NEPA requires a hard look. And we have no assurance on this record that the agency has taken a hard look. So if we start with the premise that some of these are reasonably foreseeable, perhaps low probability, but are reasonably foreseeable, don't we satisfy your concerns about security by just enforcing the rule that we make sure that the agency has taken a hard look? Well, we have taken a hard look. That's not evident from the documents, though, is it? I believe we have. If you look at the record, and we cite several things in our brief. First of all, we've done an in-depth, we started an in-depth security review. We have a congressionally mandated rulemaking, which we filed information on under 28J last week with the court, which talks about the design basis threat at all the nuclear facilities. There's another rulemaking involving the same I think it's supposed to look, we're talking about hard look under the environmental laws. Isn't that what we're supposed to be talking about? That's correct, Your Honor. Those things were not under the environmental laws, were they? That's correct, but again, how do we assess the probability of an attack? Do we have, say, five guys in a boat? Do we have four guys in a boat and three in a helicopter? Can we just answer Judge Thomas' question? How, on this record, is there indication of a hard look on the environmental issues? Because we have gone, first of all, we've done an environmental assessment, which is a fairly substantial piece of work. Okay. That's one. What did you do in that? I'm sorry? And what did you do in that to make a hard look? In that, we looked at all the various options. We looked at the various, at the no-action alternative. We looked at the idea of where the various places on the site are. In doing that, did you consider the issue of a possible terrorist attack? No, Your Honor. We did not. Again, we believe that under the It seems to me that that's the question, whether you took, whether you're required to consider that or not. But under a metropolitan edison. Well, let's assume for the sake of argument that we would construe metropolitan line of cases differently and would require that we construe them under these facts that you're required to take a look. You'd have to concede. I mean, that's the, you're solely basing it on a legal argument here on causation, which may or may not bear out. Well, we, first of all, we have In fact, I guess, just to make sure we're proceeding on common ground, you have to concede that under the current environmental assessment, you did not take this into consideration. That's correct. And you based it because it was too remote and speculative, right? That's correct. We based it But on other agency action, you've considered it not so remote or speculative, and you're doing rulemaking and you're taking actions to to guard against that because you don't view those. In reality, you don't view those threats as speculative to you. The fact that we are doing something under the Atomic Energy Act, under one act, does not necessarily mean that we have to do something under the, under NEPA. No, no, but it may mean that it's not so speculative that it's impossible to deal with. That doesn't have, that may not answer the question of whether you're required to look at it. No, but it may answer the question of whether this is so difficult a subject that it's not something that you should be required to deal with. Under Ground Zero, for example, in the Ground Zero case, this Court held that simply because the Navy built the base at Bangor to guard against a nuclear accident with the handling of the missiles did not mean that it had to do a NEPA analysis of an accident handling those missiles. The fact that we have certain responsibilities under the Atomic Energy Act to guard against accidents, no matter how remote and speculative, doesn't... I don't understand really what's so remote and speculative about the possibility of a terrorist attack. I thought that we were being warned all the time about the possibility of a terrorist attack, and that was the government's position, that there is a real possibility of a terrorist attack. We're in a state of war against terrorism. We should all be alert to a terrorist. Isn't that what we get told constantly by the government? Not by us, necessarily. Oh, by the President. Right, still, but I mean, there's no more finding or no more allegation that there are going to be terrorist attacks at nuclear facilities, and there are bridges or railroads or subway lines or any other... No, I think you've listed the ones that we're told they're most concerned about. Harbors, rail lines, subways, nuclear facilities. Well, again, we are concerned about that, but we... But despite the fact that they're remote and speculative, we still go out and defend against them. But that doesn't make them, make us responsible for analyzing them under NEPA. Does your agency want to tell the public that it's remote, that there will be a terrorist attack? It is not. It is not reasonably foreseeable, Your Honor. That is our position, that there will be a terrorist attack at Diablo Canyon or at any specific nuclear plant. Now... Go ahead. That's right. I was going to say, the problem with that argument is, because we don't know which one, we don't have to do anything about any of them. That's not our argument. I mean, we are doing plenty. But our argument is... I mean, under the environmental laws. Right. But our argument is that under the environmental laws, that the license issued is not the proximate cause of those terrorist attacks, that that is an intervening event. If we license a facility at Diablo Canyon, we have to take into account the conditions there. We have to take into account earthquakes. We have to take into account any impact an earthquake would have on the facility. That's the proximate cause of the license that's going to be issued. Well, it's an intervening cause. Yeah. You give the license and the intervening cause is the damage. Why isn't this any different if in fact it meets the definition of reasonably foreseeable but low probability? Because, in other words, if we put the plant there, it's reasonably foreseeable that the conditions there will have impacts on it. Whatever, in other words, default lines that run through there. The weather that always goes through there. In other words, you can look at it and you can make a prediction and you can make some sort of determination about it. You cannot make a prediction about a terrorist attack. That's really a different argument from the intervening cause. Your proximate cause and being unable to make a prediction are two different things. I thought we sort of explored the question of whether you could find a terrorist attack to be so remote that you can't make a prediction. And we were off on your other point that it doesn't matter because it's an intervening act and it's not proximate cause. That's correct. So that was the question, I think, is how is this different from an earthquake? Because an earthquake, if you put a plant there, you're going to you realize you're going to accept whatever earthquake odds are there. Yes. In Diablo Canyon, for example, there are faults nearby. You can study the faults, you can make a determination and you can predict with some degree of certainty what size of earthquake you're going to have. You cannot predict what type of terrorist attack. But that's the point of whether it's so remote that you can't predict it as opposed to the point of whether it's not proximate cause or whether it's an intervening third party act. I thought you were saying that it's that the act is that it's not proximate cause because it's a third party. It is. OK. It's both. In other words, we expect whether you could predict it. I mean, suppose you had a pronouncement from Bin Laden when we have not yet found, we'll say at that point. And he gives you a pronouncement. If you store these here, I guarantee you within one week we're going to attack this plant. So, you know that there's going to be an attack. Is that still an intervening cause or is it because it's a third party? It is still. Those are two different issues. Is the theme is one. Yeah, I don't see anything different from an earthquake, though, because in classic tort law, if we take that as an example, that would be an intervening superseding cause of the problem rather than the licensure. I understand. But it seems to me I share Judge Reinhart's confusion on this is that you're mixing them both up in terms of probabilistic analysis. That's the proper analysis. Fine. But you seem to be taking the view that any sort of that you are not required to look at any third or third party or are intervening causes at all. That's correct. In other words, if we're building a plant, if we're licensing a facility, we can expect certain impacts on that facility or from that facility because of where we're putting it and when. But the earthquake is an intervening cause. It's not from it's a you know, the facility itself will cause certain effects. For example, if we have a coal to say so, let's say it's a coal fire generating plant. It's going to put sulfur dioxide in the air. That's something from the facility. Now, if you get hit, it hits with a tornado or a hurricane or or an earthquake, that's an intervening cause. We consider that to be those things to be reasonably foreseeable and that they are not intervening causes. You don't think there's such a thing as a reasonable, reasonably foreseeable intervening cause? I'm sorry? You do not think there's any such thing as a reasonably foreseeable intervening cause? I think that's our feeling is that if you've got a third party acting, which is not part of what we have designed a plant for or licensed the plant for, that's an intervening cause, which is not in the action that they would do is not proximately caused by our issuing the license. We do that if it's reasonably foreseeable, if it's we still believe that that's not reasonably. I see my time is up and I want to take Mr. Repco a chance. I think the court first. Good afternoon, my name is David Repcom, counsel for Pacific Gas and Electric, and PG&E is the intervener in the case to support the government's position. Really just want to make a couple of points to follow up to the line of questioning this morning. First, our position is, as was the NRC's, that NEPA is not a threat assessment statute and can't be stretched that far. Congress has certainly indicated its ability to force the NRC to do things in terms of security post 9-11. They have not chosen to do that under NEPA. They've chosen to do that under the Atomic Energy Act, for example, in the recently enacted Energy Policy Act. The Atomic Energy Act is amended to require the NRC to conduct a design basis threat rulemaking that specifically contemplates certain terrorist attacks. I think it would be a tremendous stretch to say that the terrorism assessments are within the original intent of NEPA. There's certainly nothing that's been cited to in the statute or in the legislative history that shows that that was the goal of NEPA. The hard look standard certainly is a classic NEPA standard, but it assumes a priori that the impact that you're looking at is within the scope of NEPA. And our point is that terrorism is not. And what the effects are if there's a release into the environment. I think that's the, isn't that the touchstone that we have? Again, that takes you to the issue of what is the effect of the licensing action. And the first legal basis under NEPA that's been referred to as the Metropolitan Edison line of case is the causation. And our position is that that effect is the effect of a terrorist act, not the effect of a licensing action. So there is a causation, approximate cause argument. And I think that clearly is the case here, that there's a chain of causation, the restatement of torts. Certainly we didn't brief this as a tort case, but an intervening criminal act does break the chain of causation in tort law. I think the cases that have been referred to Metropolitan Edison. Let me ask you the same question. Even if it's a reasonably foreseeable intervening act, you say it would not be approximate cause. That's correct. Approximate causation would be an independent standard. Regardless of whether it's predictable, almost inevitable, as long as it's a third party, then it breaks the chain. If there's a causation issue, that's where an act of Congress to step in post 9-11 and say, NRC, federal government, you need to do something more. And in fact, they have done that. Now, with respect to the second basis to exclude the NEPA risk, that's the so-called limerick ecology action case in the line of cases that says the risk is essentially unquantifiable. That remains the case to this day. Even the petitioners in their petition that support. You quantify the risk of an accident, don't you? You can quantify the risk of certain kinds of accidents. You cannot quantify the risk of a terrorist attack at this particular site of a particular kind. I don't understand that. Why can't you? I mean, let's take the truck bomb. I mean, that's a fairly simple analysis. Either either it's going to have it's going to reach the caskets or it's not, depending on the on what type of vehicle. Those are perfectly quantifiable results and events. The risk is a function of two things, the probability of the attack and the consequences of that attack. If it were to occur, it's the first part that's not quantifiable. It's a low issue that they've said, not to interrupt, but they've indicated that the standard is low probability. Do you accept that? And I accept that it's low probability. The affidavit presented by the petitioners on the record, it's at Bates 171, their own expert accepts that the probability of a terrorist attack is not quantifiable. So then in terms of limerick ecology action, the court's concern was they cannot remand the case for a standard list proceeding. So if you don't know what the probability of the event event is, you can certainly you can certainly discuss defenses and mitigating measures. But why is that going to how will that affect your decision making capability if you don't know what the likelihood of that particular attack is? It you it would lead to the thinking of continually hardening the facility, making the structural issues and the design basis threat bigger or or use your use berms or or put them in different areas. Those are those are fairly concrete examples of those are concrete examples of mitigating measures that could be considered. The issue, however, is not whether they can be considered. The question is whether you can evaluate the probability of the event that you would be putting them in for in contrast to the earthquake example, where you have a tremendous amount of technical study and data that says the probability of this particular earthquake at this particular site is X. And in fact, the facility is designed for that plus a margin of safety. That's exactly what the commission has done in terms of security requirements. They don't require the evaluation of the aircraft attack because, for one, they can't evaluate the probability, the likelihood of that. And number two, I think it's important to to remember that in the private fuel storage case, which is the adjudicatory precedent they rely on here, they went to great pains to say that the in fact, the commission's view was that that's a very the risk of that event. The aircraft attack is actually minuscule was the words they used because they said the Aviation Administration, the federal government and others to to, in a sense, assure that the bad guys don't get the airplanes again. Well, I suppose they could have done that here, but they didn't do that in this particular case, did they? Well, they did that. They've made that decision in an adjudicatory decision on the legal issue of the scope of NEPA. They applied that precedent in this case. It's the problem is they could have said, I suppose, you know what, that this this is minuscule, you know, that there's a minuscule chance of this because of these reasons. But they didn't say anything with reference to this particular facility. I believe certainly in the adjudicatory decision, they did reference the PFS decision in their basis for the decision there, whether they actually block quoted. I can't remember whether they did or not, but certainly they referenced the case. And in a sense, they're really just applying legal precedent. I think the last point I want to make, though, is the petitioner's argument is that they were not have not been given an opportunity to to present their their evidence. In fact, the commission has given them several opportunities. They could petition for rulemaking on the security issue that the NRC said that they were conducting a generic review of. They could petition to enter into that process and present their data. They could have sought a waiver to inject these issues in the site specific licensing case, which the commission allows for if they can show there's something unique about this site. They didn't do either of those two things. And in fact, their affidavits didn't show anything unique about the Diablo Canyon site that made it a particular terrorist target. So the NRC's generic rules as to what adequate safety is, what's adequate security, should apply and were applied to this case. Why shouldn't we take a generic approach to terrorist threats as opposed to a site specific approach? Why should you or why shouldn't? In other words, there seems to be a undercurrent, if you will, that the plaintiffs have to show there's something about this particular site that makes it more terrorist prone when the whole theory of preparation for terrorist attacks against nuclear facilities seems to be that it can happen anywhere. It's generic threat. And therefore, we ought to guard against it, as we would any other generic issue, for example, accidental release of nuclear material. I think there's two things there. At first, the NRC has chosen to deal with the security requirements as a generic matter under the APA as a rulemaking or rule of general applicability. But the commission's standards are performance standards that are ultimately applied case by case in terms of the defenses that a particular utility or particular licensee puts in place. Ultimately, the security plan is very much specific, but the rules themselves, the performance rules, are established in a rulemaking. And our point is that a challenge to the rules would not be appropriate in a specific licensing case. Thank you. We'll give you five minutes for rebuttal. Thank you. I'd just like to respond to a couple of things that were said. I'd like to get back to the issue of proximate causation. And I think one of the things that is highlighted by the state tort cases involving intervening criminal acts in looking at proximate cause, there's two factors that the court looks at to find a duty of care from the owner of a dangerous vehicle or machine to someone who gets hurt by it as a result of some criminal act. And one is if it's particularly attractive and would be something that someone who shouldn't be playing with it would be attracted to. For instance, the Richardson versus Ham case involved a bulldozer that was left unlocked and some joyriders took it and did a lot of damage with it. And the court said, well, this was a real attractive machine and the owner should have known that somebody would have wanted to jump on it and go for a ride. And the other thing about it was that it was real hard to control, real dangerous. And so therefore, the person should have, the owner should have known that if somebody did get a hold of this thing, he or she could do a lot of damage. And it's a similar analogy here that one of the reasons why nuclear facilities are attractive targets is because if one were to attack them and to breach their containments, then one could do a great deal of harm, a great deal of environmental harm and harm to public health. And the other thing is they're very dangerous. And that once the containment's breached, it's very difficult to control it. So that this is the kind of a situation that creates that duty of care. If you're going to continue that analogy that the Supreme Court made to tort law in the Metropolitan Edison case. Why isn't this better addressed through rulemaking? I'm sorry? Why isn't this better addressed through rulemaking? It seems to me to be the sort of thing that would be an appropriate subject of a rulemaking, but we don't have any control over how the NRC chooses to deal with these things. All we can do is we submitted a hearing request and we asked to be heard on the issue of reasonable foreseeability, which at that point had not been addressed in an NRC decision since 1985. At the time that we filed our hearing request, the PFS decision wasn't out. The PFS decision came out just a couple of weeks after the licensing board referred our contention to the commission. So at that point there wasn't anything except that 1985 appeal board decision that said, because we can't quantify these effects, we're not going to look at them. We didn't have any of the kind of, the NRC hadn't laid out its rationale in the PFS case and asked for comment on it, which seems to me to be a reasonable way to do it. For instance, the NRC says this would be a bottomless inquiry. That seems to me to be a factual issue that could be commented on in a rulemaking or the NRC says, this is the kind of thing that we can't discuss in public at all and we, and we're not going to do it. We're not going to take a hard look because we can't talk about it. That's also a factual issue that we would have liked to comment on in a rulemaking. But I thought the problem is you didn't go that route and you try to attack the rule in the context of a proceeding in which you're not entitled to attack a rule. There's no rule. There's no rule. There's a 19, there was a 1985 decision in the Limerick case and then there was the PFS decision. There's never been a rulemaking. No, but I think, I think their argument was you could petition for rulemaking and that was an alternative remedy that you should have pursued. Well, we were in a licensing case. No, I understand that. But my initial question was why, why isn't it better to pursue it through a petition for rulemaking as opposed to contesting? Well, really easy answer. We wanted the review before the license issued. We wanted, and the best way to get that in a timely way is an adjudication. If the NRC were to say to us, well, listen, you've raised a generic issue and we're going to do a rulemaking, we would have said fine, but you must suspend the issuance of this license until the rulemaking is completed. That's the important thing. The NEPA analysis has to be done before the license issues and it hasn't been done here in any respect. I also think I heard Mr. Mullins say that in the course of the safety review, the NRC does not look at any threats that it considers to be remote and speculative effects, and if I heard him correctly, I don't believe that's true. The Atomic Energy Act and its regulations are designed to look at what the NRC foresees as design basis or likely threats. The NRC does not look at any threats it considers to be remote and speculative, either under the Atomic Energy Act or NEPA, and we're not arguing with that. I just want to clear that up. That's not something that we do. Kennedy said that your expert says that it's not a quantifiable threat. Right. But that doesn't excuse the NRC. Under 10 CFR 51.71, the NRC has to make a qualitative analysis, and it showed itself capable of doing that in the vehicle bomb rule. It said we think now, you know, we never used to think we could analyze these things because we couldn't quantify them, and we now see that there's that we need to do a and here's how we're going to do it, and that happened to be with respect to vehicle bombs, and that happened to be under the safety regulations, but the thinking, the logic, the kind of analysis that one would expect of the agency in this case was demonstrated in that instance, and we don't understand why the NRC is avoiding doing that here, continuing that kind of analysis when it's demonstrated itself to be capable of it. Thank you, counsel. Thank you. Case just argued will be submitted. The court will stand in recess for the day.
judges: Reinhardt, Thomas, Restani